**HAMILTON CHAPTER OF ALPHA DELTA PHI, INC., Alumni Association of Psi Chapter of Psi Upsilon, Inc., Beta of Sigma Phi Society, Inc., and Delta Kappa Epsilon Society of Hamilton College, Plaintiffs–Appellants,**

v.

**HAMILTON COLLEGE and Eugene M. Tobin, President of Hamilton College, Defendants–Appellees.**

**No. 702, Docket 96–7599.**

United States Court of Appeals, Second Circuit.

Argued Jan. 21, 1997.

Decided Oct. 10, 1997.

Clark R. Silcox, Washington, DC (Cheryl M. Browning, Steele Silcox & Browning, Washington, DC, on the brief), for Plaintiffs–Appellants.

David M. Lascell, Rochester, NY (John R. Simon, Hallenbeck, Lascell, Norris & Zorn, Rochester, NY, Robert B. Bell, Wiley Rein & Fielding, Washington, DC, on the brief), for Defendants–Appellees.

Before: KEARSE and JACOBS, Circuit Judges, and GLEESON, District Judge.*

GLEESON, District Judge:

Four Hamilton College fraternities brought this action against Hamilton College ("Hamilton") and its president, Eugene M.

---

* Honorable John Gleeson, United States District Judge for the Eastern District of New York, sitting by designation.

Tobin, alleging a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. The fraternities challenge Hamilton's residential policy, which requires all of its students to live in college housing and participate in a college meal plan. According to plaintiffs, that policy unlawfully monopolizes the market for residential services in Clinton, New York. The United States District Court for the Northern District of New York, Rosemary S. Pooler, *Judge*, concluded that Hamilton's provision of room and board pursuant to its residential policy is not "trade or commerce" and lacks a substantial nexus to interstate commerce, and dismissed the complaint for lack of subject matter jurisdiction. For the reasons set forth below, we reverse.

## BACKGROUND

### A. *The Facts*

Hamilton is a private college located in Clinton, New York. Chartered in 1812 as an all-male college, it became fully co-educational upon its consolidation in 1978 with nearby Kirkland College. It draws more than half of its students from foreign countries and states other than New York. During the 1993–94 school year, for example, only 41% of its 1,668 students were residents of New York State.

For many years, Hamilton required only first-year students to live in college-owned housing and to participate in a college-run meal plan, and permitted students in their second, third and fourth years to room and board in fraternities or other private housing not owned or controlled by the college. In the spring of 1994, however, Hamilton began changing this residential policy by formally restricting the number of students who could live off-campus. Then, on March 3, 1995, Hamilton announced that, effective September 1995, all students would be required to live in college-owned facilities and to purchase college-sponsored meal plans.

In the 1993–94 school year, before the implementation of the new policy, Hamilton received more than $7 million in revenues for providing such services, while the fraternities and other off-campus landlords received approximately $1 million. Plaintiffs contend that Hamilton's new residential plan has a commercial purpose: to eliminate competition in the provision of "residential services" (essentially, room and board) to Hamilton students in order to raise revenues. They further allege that Hamilton, having announced that the private ownership societies that own the fraternity houses will be unable to house Hamilton students, has attempted to exercise monopoly power as the sole available buyer by attempting to purchase the fraternity houses at artificially low prices, intending to use them to provide housing for its students.

On the other hand, Hamilton submitted affidavits and documentary evidence to the district court attempting to demonstrate that the primary purpose of the challenged residential plan was entirely noncommercial. According to Hamilton, the purpose of the plan is to create an academic environment that is more appealing to female applicants to Hamilton. According to the Chairman of the Board of Trustees,

fewer than 20% of the current students, self-selected [fraternity] males who have inherited these [fraternity houses,] virtually control social life on [Hamilton's campus]. Women students tell us time and again that, while they are fond of Hamilton, they do not feel they have the same social and residential opportunities as their male classmates. They do not enjoy—and cannot afford to replicate—the privileges of fraternity life. More disturbing is evidence that this disparity is leading many of the most talented prospective female applicants to seek education elsewhere.... The most disturbing result, however, has been increasing evidence that Hamilton is in danger of being perceived more for its social life than for its academic rigor....

### B. *Procedural History*

On July 10, 1995, the four plaintiff fraternities—the Psi Chapter of Psi Upsilon, Inc., the Hamilton Chapter of Alpha Delta Phi, Inc., Beta of Sigma Phi Society, Inc., and Delta Kappa Epsilon Society of Hamilton College—brought this action pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), alleging that Hamilton's residential policy violates Section 2 of

the Sherman Act, 15 U.S.C. § 2.[1] Plaintiffs seek damages, injunctive relief and attorneys' fees. Simultaneously with the filing of the complaint, the fraternities sought and the district court issued an order directing defendants to show cause why a preliminary injunction should not be entered enjoining the implementation of the residential policy announced on March 3, 1995.

On August 1, 1995, defendants moved to dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Defendants argued that the provision of room and board to Hamilton students is not "trade or commerce" within the meaning of Section 2 of the Sherman Act. They further argued that Hamilton's conduct had an insufficient nexus to interstate commerce to fall within the boundaries of the Sherman Act.

On October 2, 1995, the district court heard oral argument on plaintiffs' motion for a preliminary injunction and defendants' motion to dismiss. In addition to their jurisdictional arguments, defendants urged the court to dismiss the complaint because the relevant product market was not the market for room and board for Hamilton students, as alleged in the complaint, but the market for highly selective liberal arts colleges in which Hamilton competes for students with more than 100 colleges. In support of this claim, defendants submitted the affidavit of Jerry A. Hausman, a professor of economics at the Massachusetts Institute of Technology. Defendants acknowledged that any disposition on this ground would require the court to convert the motion to dismiss into one for summary judgment, as permitted by Rule 12(b) of the Federal Rules of Civil Procedure. At the conclusion of the oral argument, the court took both motions under advisement.

On October 12, 1995, the district court notified counsel by letter that it anticipated relying on the Hausman affidavit. Pursuant to the requirement in Rule 12(b) that the parties be given a reasonable opportunity to present affidavits and other material pertinent to a motion for summary judgment, the court invited any such material, expressing particular interest in plaintiffs' response to the relevant market and market power assertions in the Hausman affidavit. In response to the district court's invitation, plaintiffs submitted, among other things, the affidavit of an economist, William O. Kerr, who asserted that the primary market relevant to plaintiffs' antitrust claim is the market for the sale of residential services to Hamilton's students.

In a written decision dated April 12, 1996, the district court granted the defendants' motion to dismiss. Despite the numerous affidavits submitted by both parties, the court did not convert the motion into one for summary judgment, but rather stated that it based its decision on the complaint alone, and held that it lacked subject matter jurisdiction. Specifically, the court held that the allegations in the complaint failed to establish that the provision of residential services under the challenged residential policy was "trade or commerce," and thus subject to the prohibitions of the Sherman Act. It further held that the complaint failed to establish the requisite nexus between Hamilton's conduct and interstate commerce. The court did not reach the issues of the relevant product market and Hamilton's market power.

## DISCUSSION

A. *The Standard For Dismissal Under Rule 12(b)(1) and (6)*

▮▮ A court's task in determining the sufficiency of a complaint is "necessarily a limited one." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). The issue is not whether a plaintiff will or might ultimately prevail on her claim, but whether she is entitled to offer evidence in support of the allegations in the complaint. *Id.* "Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Id.* A dismissal is warranted under Rule 12(b)(6)

---

1. Section 2 of the Sherman Act provides, in relevant part:

   Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony....

only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996). In addition, in ruling on defendant's motion, the court must accept as true all the factual allegations in the complaint and must draw all reasonable inferences in favor of the plaintiff. *Hospital Building Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 740, 96 S.Ct. 1848, 1850, 48 L.Ed.2d 338 (1976).

▇▇▇ This generous approach to pleading applies in the antitrust context. *Furlong v. Long Island College Hosp.,* 710 F.2d 922, 927 (2d Cir.1983). Where, as is the case here with respect to Hamilton's interstate commerce argument, a jurisdictional challenge is addressed to the complaint, the analyses under Rule 12(b)(1) and Rule 12(b)(6) merge: the critical inquiry is into the adequacy of plaintiffs' allegations that the challenged conduct affects interstate commerce. *See Hospital Building Co.,* 425 U.S. at 742 n. 1, 96 S.Ct. at 1851 n. 1. Moreover, where the proof of the alleged antitrust violation is largely in the hands of the defendants, dismissals prior to giving the plaintiff an opportunity for discovery should be granted sparingly. *Id.* at 746, 96 S.Ct. at 1853. This standard, which is "concededly rigorous," *id.,* has not been met by the defendants.

B. *"Trade or Commerce" Under the Sherman Act*

▇▇▇ Although there is no blanket exemption from the antitrust laws based on an organization's non-profit status or public-service orientation, *see National Collegiate Athletic Association v. Board of Regents of the University of Oklahoma,* 468 U.S. 85, 100 n. 22, 104 S.Ct. 2948, 2960 n. 22, 82 L.Ed.2d 70 (1984); *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 787–88, 95 S.Ct. 2004, 2013–14, 44 L.Ed.2d 572 (1975), the Sherman Act does not apply to all activities of all organizations. Plaintiffs may challenge Hamilton's provision of room and board pursuant to its residential policy under the Act only if that conduct constitutes "trade or commerce." 15 U.S.C. § 2.

Congress intended the antitrust laws to apply to a wide array of commercial conduct, *United States v. South–Eastern Underwriters Association,* 322 U.S. 533, 553, 64 S.Ct. 1162, 1173–74, 88 L.Ed. 1440 (1944) ("[l]anguage more comprehensive [than that used in §§ 1 and 2 of the Sherman Act] is difficult to conceive"), so as to foreclose unfair business practices wherever they occur. *See Goldfarb,* 421 U.S. at 787–88, 95 S.Ct. at 2013–14. This broad application serves the Sherman Act's essential purpose: safeguarding consumer welfare. *See National Collegiate Athletic Association,* 468 U.S. at 107, 104 S.Ct. at 2963. On the other hand, the legislative history of the Sherman Act reveals that it was not intended to reach noncommercial activities that are intended to promote social causes. *See generally National Organization for Women v. Scheidler,* 968 F.2d 612, 617–21 (7th Cir.1992), *rev'd on other grounds,* 510 U.S. 249, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994); *Missouri v. National Organization for Women,* 620 F.2d 1301, 1304–09 (8th Cir.), *cert. denied,* 449 U.S. 842, 101 S.Ct. 122, 66 L.Ed.2d 49 (1980). As stated by the Supreme Court in *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 493 n. 15, 60 S.Ct. 982, 992 n. 15, 84 L.Ed. 1311 (1940):

> The history of the Sherman Act as contained in the legislative proceedings is emphatic in its support for the conclusion that "business competition" was the problem considered and that the act was designed to prevent restraints of trade which had a significant effect on such competition.

Thus, the Sherman Act prevents "restraints to free competition in business and commercial transactions which tend[ ] to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers of goods and services." *Id.* at 493, 60 S.Ct. at 992.

Accordingly, the noncommercial activities of certain organizations have been found to be outside the scope of the antitrust laws. For example, in *Apex Hosiery,* the Court found that a labor union's sit-down strike was not "trade or commerce" under the Sherman Act. *Id.* at 483–84, 60 S.Ct. at 986–87; *see also National Organization for Women v.*

*Scheidler,* 968 F.2d at 621 (violent pro-life protests that successfully closed abortion clinics did not constitute trade or commerce under the Sherman Act); *Missouri v. National Organization for Women,* 620 F.2d at 1319 (organization's boycott of states for failing to ratify the ERA did not constitute trade or commerce).

Although the Sherman Act applies "only to a very limited extent to organizations, like labor unions," which normally act with noncommercial objectives, *Klor's, Inc. v. Broadway–Hale Stores, Inc.,* 359 U.S. 207, 213 n. 7, 79 S.Ct. 705, 710 n. 7, 3 L.Ed.2d 741 (1959), as noted above, the Supreme Court has since made clear that an organization's status alone does not prevent antitrust scrutiny. Rather, in determining whether particular conduct is "commerce," a court's principal focus must be on the nature of the activity, rather than the form or objectives of the organization.

In the context of higher education, certain activities have been held to be so central to the educational mission, and so far removed from the "business competition" regulated by the Sherman Act, that they are not "trade or commerce." The most prominent such decision is *Marjorie Webster Junior College, Inc. v. Middle States Association of Colleges and Secondary Schools, Inc.,* 432 F.2d 650 (D.C.Cir.), *cert. denied,* 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970). In that case, the defendant was a non-profit educational corporation that functioned as an accrediting agency for schools in the middle Atlantic states. Because non-profit status was a prerequisite to accreditation, the defendant denied the application of Marjorie Webster Junior College, a for-profit college. The college brought suit, alleging that the non-profit requirement violated Section 3 of the Sherman Act, 15 U.S.C. § 3, and the district court agreed. *See id.* at 652.

The D.C. Circuit reversed. It found that the defendant's objectives, both in its formation and in the development of its accreditation policy, were plainly noncommercial. It further observed that the Sherman Act's proscriptions were tailored for the business world, not the "non-commercial aspects of the liberal arts and the learned professions."

*Id.* at 654. In that setting, the court concluded, "an incidental restraint of trade, absent an intent or purpose to affect the commercial aspects of the profession, is not sufficient to warrant application of the antitrust laws." *Id.* (footnote omitted). Absent such a motive, the accreditation process was "distinct from the sphere of commerce; it [went] rather to the heart of the concept of education itself." *Id.* at 655. Building on this logic, admissions criteria have also been found to be "noncommercial in nature" and beyond the scope of the Sherman Act. *See Selman v. Harvard Medical School,* 494 F.Supp. 603, 621 (S.D.N.Y.), *aff'd,* 636 F.2d 1204 (2d Cir. 1980).

At the other end of the spectrum, certain activities in higher education are so proprietary in nature that the applicability of the Sherman Act is not even questioned. In *National Collegiate Athletic Association v. Board of Regents of the University of Oklahoma,* 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984), two universities challenged the National Collegiate Athletic Association's (the "NCAA's") college football television plan, which limited the number of games that could be broadcast. The NCAA, a non-profit educational association, did not rely on its non-profit character as a basis to avoid antitrust jurisdiction, *id.* at 100 n. 22, 104 S.Ct. at 2960 n. 22, and the Court upheld a judgment against the NCAA despite noting that its role in maintaining amateurism in college sports and preserving the student-athlete in higher education is entirely consistent with the Sherman Act. *Id.* at 120, 104 S.Ct. at 2970.

Similarly, when a private bookseller charged that Temple University's bookstore engaged in predatory pricing in violation of Section 2, there was no suggestion that the university was not engaged in "trade or commerce." *See Sunshine Books, Ltd. v. Temple University,* 697 F.2d 90 (3d Cir.1982). Indeed, in the only reported case involving an antitrust challenge to a university housing policy requiring certain students to live in university residence halls, the parties and the court appear to have assumed that a private landlord's Sherman Act claims satisfied the "trade or commerce" requirement. *Ameri-*

can *Nat'l. Bank and Trust Co. of Chicago v. Board of Regents for Regency Universities,* 607 F.Supp. 845 (N.D.Ill.1984).

In between these two extremes are closer cases, including the Third Circuit's decision in *United States v. Brown University,* 5 F.3d 658 (3d Cir.1993). In that case, the Massachusetts Institute of Technology ("MIT") and eight Ivy League colleges and universities agreed that, through shared information and the use of the same criteria, any commonly-admitted student would be offered a comparable financial aid package from each school. The effect of the schools' agreement was to collectively set the amount of financial aid extended to each commonly-admitted student. The Justice Department brought suit, alleging that this arrangement restrained trade in violation of Section 1 of the Sherman Act. *Id.* at 661–63.

MIT argued that the conduct challenged by the government was not trade or commerce. Specifically, it contended that the financial aid agreement increased access to the member schools by widening the pool of applicants that could afford to attend them and enhanced the quality of education by promoting the socio-economic diversity of the student bodies. In light of these goals, and relying heavily on *Marjorie Webster,* MIT argued that the agreement at issue was a "noncommercial aspect[ ] of the liberal arts" and thus beyond the reach of the Sherman Act. *Id.* at 667.

The Third Circuit rejected MIT's argument. It drew a distinction between the "distinctly noncommercial" accreditation activity in *Marjorie Webster* and the "commercial process of setting tuition." *Id.* at 666–67. Because the challenged conduct bore directly on the price charged to students, an essentially commercial transaction, it fell within the realm of trade or commerce. *Id.* at 668.

The case law thus recognizes that institutions of higher learning engage in a wide spectrum of conduct, ranging from the distinctly noncommercial to the purely proprietary. It also reflects some disagreement, particularly in the context of college sports, as to whether an asserted noncommercial objective of a challenged restraint affects the "trade or commerce" inquiry, the substantive

antitrust analysis, or both. *Compare Jones v. National Collegiate Athletic Association,* 392 F.Supp. 295, 303 (D.Mass.1975) (denying preliminary injunction because NCAA's "no-compensation" rule, which strips college athletes who played for compensation of eligibility, likely has no nexus to trade or commerce) *and Gaines v. National Collegiate Athletic Association,* 746 F.Supp. 738, 743 (M.D.Tenn.1990) (applying *Jones* to the NCAA's "no-draft" and "no-agent" rules) *with Banks v. National Collegiate Athletic Association,* 746 F.Supp. 850, 858–62 (N.D.Ind.1990) (refusing to exempt the "no-draft" and "no-agent" rules from antitrust scrutiny, but holding that they likely survive "Rule of Reason" analysis); *see also Brown University,* 5 F.3d at 665–68 (even where noncommercial social welfare goals do not remove a defendant's conduct from the realm of trade or commerce, they will influence the merits of the Sherman Act claim).

The fraternities argue that anything a college or university does to enhance its reputation is, as a matter of law, commercial activity subject to antitrust scrutiny. We disagree. Some conduct, such as determining the content of curricula, for example, is distinctly noncommercial in character, and the Sherman Act does not apply to these aspects of higher education. *See Brown,* 5 F.3d at 667; *Marjorie Webster,* 432 F.2d at 654.

This analysis may lead to some difficult decisions, including ones that cannot be made without providing the plaintiff an opportunity for discovery. As the D.C. Circuit recognized in *Marjorie Webster,* even superficially noncommercial activity could conceivably have a commercial motive that would subject it to the antitrust laws. *Id.* at 654–55 & n. 21 ("[f]or example, if accreditation were denied any institution purchasing textbooks from a supplier who did not provide special discounts to association members, it would be hard to imagine other than a commercial motive for the action").

In this case, the district court concluded that Hamilton's residential policy was not trade or commerce because it could not be extricated from Hamilton's academic mission.

The court noted that Hamilton had responded to evidence that the fraternities' dominance of social life on campus was leading the most talented of Hamilton's prospective female students to enroll elsewhere and had begun to drive away top male applicants as well. The residential policy, the court held, was no different than admissions criteria—both are academic decisions by which Hamilton seeks to shape its unique learning environment—and thus concerns neither trade nor commerce.

■ As a preliminary matter, the district court incorrectly characterized the "trade or commerce" inquiry as jurisdictional. Whether or not a challenged activity constitutes "trade or commerce" within the meaning of the Sherman Act is not a jurisdictional question. Congress's enactment of the Sherman Act was an exercise of its power to regulate interstate and foreign commerce. *See, e.g., Summit Health, Ltd. v. Pinhas,* 500 U.S. 322, 329 n. 10, 111 S.Ct. 1842, 1846 n. 10, 114 L.Ed.2d 366 (1991). In the absence of a sufficient nexus to such commerce, federal courts lack subject matter jurisdiction over an antitrust claim. However, assuming such a nexus exists, the inquiry into whether the impact of the challenged activity is merely incidental to a noncommercial purpose, or is distinctly noncommercial in character, is a question that goes to the substantive reach of the Sherman Act, not to the jurisdiction of the court. A ruling that the challenged conduct does not come within the scope of the Sherman Act thus is not necessarily a ruling that the court lacked jurisdiction over the claim. The district court's holding that Hamilton's conduct was not "trade or commerce," though described by the court as relating to subject matter jurisdiction, was in fact a determination of the merits of plaintiffs' claim.

This determination was also erroneous. Although the district court stated that it accepted as true all of the factual allegations in the complaint, its opinion accepts and relies upon Hamilton's assertion that its "deci-sion regarding residential services concerns education rather than commercial gain." *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College,* No. Civ.A. 95–CV–0926, 1996 WL 172652, at *6 (N.D.N.Y. April 12, 1996). The plaintiffs have alleged otherwise. They allege that Hamilton adopted the residential policy for the commercial purpose of raising revenues by (1) forcing all Hamilton students to purchase residential services from Hamilton; (2) allowing Hamilton to raise its prices for such services; and (3) attempting to purchase the fraternity houses at below-market prices. They further allege that Hamilton's stated purpose for the new policy is a pretext designed to obfuscate this purely commercial purpose. In the procedural posture of this case, these allegations must be accepted as true.[2] The district court's failure to do so was error.

## C. The Interstate Commerce Nexus

■■ The Supreme Court has held that, by using the phrase "commerce among the several States," Congress intended in the Sherman Act to exercise its powers under the Commerce Clause to the fullest constitutional extent. *Summit Health, Ltd.,* 500 U.S. at 329 n. 10, 111 S.Ct. at 1846 n. 10 (1991). The resulting scope of antitrust jurisdiction is broad indeed and "encompasses far more than restraints on trade that are motivated by a desire to limit interstate commerce or that have their sole impact on interstate commerce." *Hospital Building Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 743, 96 S.Ct. 1848, 1851–52, 48 L.Ed.2d 338 (1976). The commerce requirement of the Sherman Act may be satisfied in two distinct ways: (1) where the defendant's conduct directly interferes with the flow of goods in the stream of commerce (the "in commerce" test); or (2) where the defendant's conduct has a substantial effect on interstate commerce (the "effect on commerce" test). *McLain v. Real Estate Board of New Orleans, Inc.,* 444 U.S. 232, 242, 100 S.Ct. 502,

---

**2.** We need not reach here the question whether a failure to prove such a commercial motive would be fatal to plaintiffs' claim. *See, e.g., Brown University,* 5 F.3d at 667 n. 7 ("to determine whether trade or commerce is implicated, motive plays a much less important role when the nature of the activity … is plainly commercial.… A beneficent objective does not excuse commercial activities from compliance with the Sherman Act.")

509, 62 L.Ed.2d 441 (1980). Here, plaintiffs attempt to establish jurisdiction by satisfying the "effect on commerce" test.

We addressed this route to antitrust jurisdiction in *Furlong v. Long Island College Hospital,* 710 F.2d 922 (2d Cir.1983), where we rejected a standard that would permit a plaintiff to establish the requisite impact on commerce by reference to all of a defendant's business activities. On the other hand, the "narrower view" we adopted does not require a causal link between the unlawful conduct and interstate commerce; rather, the inquiry is whether the aspects of the defendant's business that are infected by the allegedly unlawful conduct can reasonably be expected, as a matter of practical economics, to have a not insubstantial effect on interstate commerce. *Id.* at 925–26 (citing *McLain,* 444 U.S. at 246, 100 S.Ct. at 511); *see also Valley Disposal, Inc. v. Central Vermont Solid Waste Management District,* 31 F.3d 89, 95 (2d Cir.1994).

The fraternities provide ample factual details in their complaint to support a nexus between the allegedly illegal conduct—Hamilton's monopolization of residential services for its students—and interstate commerce. Hamilton solicits applications across the United States and around the world. During the 1993–1994 school year, 1,668 students enrolled and matriculated on-campus, of which 1,020 (59%) came from foreign countries and states other than New York. Hamilton collects more than $7 million per year for residential services (room, board and related fees), approximately $4 million of which is charged and collected annually from students who come to live at Hamilton from outside of New York State. As a result of the new residential policy, the fraternities and other private landlords in Clinton, New York will lose approximately $1 million a year, a substantial portion of which would have been collected from out-of-state residents.

The fraternities' allegations that Hamilton's residential services are regularly performed for out-of-state students and gener-

ate significant revenues from those students are sufficient to establish antitrust jurisdiction. *See Camps Newfound/Owatonna, Inc. v. Town of Harrison,* —— U.S. ——, —— ——, 117 S.Ct. 1590, 1596–97, 137 L.Ed.2d 852 (1997) (non-profit summer camp, which caters to out-of-state residents, is "unquestionably engaged in commerce" because it "generates the transportation of persons across state lines," even though the campers' consumption of goods and services occurs only locally); *see also Summit Health, Ltd. v. Pinhas,* 500 U.S. 322, 329–30, 111 S.Ct. 1842, 1846–47, 114 L.Ed.2d 366 (1991); *Hospital Building Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 743–47, 96 S.Ct. 1848, 1851–54, 48 L.Ed.2d 338 (1976).

The district court concluded that the residential plan had no effect on commerce, since there was no evidence that it would affect the number of out-of-state students who would matriculate at Hamilton. However, whether the number of such students would change is not relevant. Indeed, the fraternities allege that Hamilton can restrict output and raise prices without losing any students. That is precisely the vice of a monopoly. Similarly unavailing is the defendants' argument that plaintiffs do not allege that the price or availability of residential services for students will in fact change. Plaintiffs have alleged, as they must, "the *potential* harm that would ensue" if their allegations of monopolistic behavior are true. *Summit Health, Ltd.,* 500 U.S. at 330, 111 S.Ct. at 1847 (emphasis added). Specifically, the fraternities allege that (1) they have been effectively eliminated from the food service market, which will permit Hamilton to charge higher rates for its food services; and (2) the quality of services offered at Hamilton College will be lower.

Accordingly, we conclude that plaintiffs have adequately alleged that the defendants' illegal activities can reasonably be expected to have a not insubstantial effect on interstate commerce.[3]

---

3. It may be that further proceedings will demonstrate that defendants' conduct in fact involves no substantial effect on interstate commerce, or even if it does, involves no violation of the Sher-

man Act. We hold only that the allegations are sufficient, and express no view on the merits. *See Hospital Building Co.,* 425 U.S. at 747 n. 5, 96 S.Ct. at 1853–54 n. 5.

## CONCLUSION

For the foregoing reasons, we reverse the district court's judgment and remand this case for further proceedings not inconsistent with this decision.