Isaac LERNER, Eli Lerner, Ballyward Investment Company, Ltd., Jaime Sohacheski, Gaston Limited, Hotel Investors, Inc., Perky Limited, Abraham Rappaport, Esther Rappaport, Moshe Cohn, Establissement Somer, Joseph Kohn, Chancery Enterprises, Ltd., Rosdev Developments, Inc., and Michael Rosenberg, Plaintiffs,

v.

FLEET BANK, N.A., Sterling National Bank and Trust Company of New York, and Republic National Bank of New York, Defendants.

Bruce Bayroff, Joshua Goldstein, Land Tech at Manalpan LLC, Theodore Brodie, Meyer Rosenbaum, Mr Associates LLC, Ilana Blumkin, as Trustee, Emdee Tours, Inc., Alexander Hasenfeld, Inc., Profit Sharing Retirement Plan, Pinchos Rubinson, Akiva Leiman, Estate of Boruch Rubinson, Chaim and Rachel Lekowitz, Naftali and Sarah Lipshutz, Mendel and Feigy Lipschutz, Reisel Bergstein, Michael Konig, Esther Wertenteil, Aaron Wertenteil, Teena Rubinfeld, Mark Wertenteil, Morris and Sarah Friedman, The Regal Trade, S.A., Vavel Corp., Chadwick Funding Co. L.P., Allen Sausen and Leonard Sausen, d/b/a Atassco, Keren Hachesed of Monsey, Inc., Geneva Properties, L.L.C., Mt. Pleasant Partners, Herscel Kulefsky, Albert David Pearls & Gems, Inc., Defined Benefit Pension Plan, Chai Properties Corp., Arthur Kurtz, Cresfield Associates, Inc., Weinreb Management and Howard Mermelstein, Plaintiffs,

v.

Fleet Bank, N.A., Sterling National Bank and Trust Company of New York, and Republic National Bank of New York, Defendants.

Nos. 98–CV–7778 FB, 98–CV–7779 (FB).

United States District Court, E.D. New York.

May 22, 2001.

Eric S. Horwitz, Edward S. Rudofsky, Zane & Rudofsky, New York City, for the plaintiffs.

Richard F. Ziegler, Cleary, Gottlieb, Steen & Hamilton, New York City, for defendant Fleet Bank.

Allen C. Wasserman, Tamara S. Loomis, Owen & Davis, New York City, for defendant Sterling National Bank.

Celia G. Barenholtz, Adena R. Abramson, Kronish, Lieb, Weiner & Hellman LLP, New York City, for defendant Republic National Bank.

## MEMORANDUM AND ORDER

BLOCK, District Judge.

Plaintiffs in both actions were investors who have been defrauded by David Schick ("Schick"), a prominent attorney and businessman. They have brought in each action identical multiple state law claims as well as federal Racketeer Influenced and Corrupt Organizations claims ("RICO") pursuant to 18 U.S.C. §§ 1962(c) and (d), seeking to recover in excess of $200 million from defendants Fleet Bank, N.A., Sterling National Bank and Trust Company of New York, and Republic National Bank of New York (collectively "defendants" or "banks") in connection with defendants' handling of certain bank accounts in a multi-million dollar Ponzi scheme orchestrated by Schick.[1] Plaintiffs rely on mail and wire fraud as the predicate acts constituting the RICO pattern of racketeering

---

1. The operative allegations in Action # 1 (*Lerner*) and Action # 2 (*Bayroff*) are identical. Accordingly, the Court consolidates them for purposes of these motions. *See Johnson v.* *Celotex Corp.,* 899 F.2d 1281, 1284 (2d Cir. 1990) (court has "broad discretion to determine whether consolidation is appropriate"); *see also* Fed.R.Civ.P. 42(a).

activity. As an association-in-fact RICO enterprise, plaintiffs name the New York State Attorney Disciplinary System. Plaintiffs claim that the enterprise was corrupted by the defendants because the banks allowed Schick to perpetuate his scheme for a protracted period of time by failing to report to the enterprise's Lawyers' Fund for Client Protection of the State of New York ("Lawyers' Fund") that Schick was writing checks against insufficient funds. Plaintiffs contend that if reporting had occurred, the Ponzi scheme would have been discovered sooner, curtailing their losses.

Defendants move to dismiss the RICO claims pursuant to Rule 12(b)(6) for a host of reasons, including plaintiffs' failure to plead the mail and wire fraud RICO components with Rule 9(b) particularity. Although not specifically referencing Rule 12(b)(1), defendants also challenge plaintiffs' standing. The Court agrees, albeit by separate analysis, that plaintiffs do not have standing and, accordingly, dismisses the RICO claims pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction. Because the RICO claims are dismissed, and the Court declines to exercise supplemental jurisdiction, the complaints, as amended, are dismissed in their entirety.

## BACKGROUND[2]

### I. The Scheme

In 1992 Schick began marketing investment opportunities based upon mortgage flip transactions. Schick's "original intentions were good" and "his modus operandi was not criminal;" however, due to "unrelated losses stemming from a 1988 'prob-lem' which came back to 'haunt' him," he began to use fraudulent means to stay afloat. Am.Compl. ¶ 3. The essence of Schick's scheme to defraud was the marketing of risk-free investments with high, short-term yields. In this regard, Schick purported to bid on distressed mortgage pools at auctions and sales conducted by the Resolution Trust Company, Federal Deposit Insurance Corporation, and other banking institutions. Schick explained to prospective investors that after being awarded a bid to purchase a mortgage pool subject to at least a ninety-day due diligence, he could re-sell the same pool to a "take-out buyer" for a substantial profit (between twelve and twenty percent),[3] subject to a due diligence period of fewer than ninety days. Am.Compl. ¶ 126. Schick assured them that if the take-out buyer declined to purchase the pool, Schick could rescind the original purchase within his own ninety-day due diligence window, thus avoiding any risk of loss.

However, Schick told the putative investors that in order to close on a bid he was required to deposit substantial sums of cash as evidence of his ability to complete the purchase. Schick misrepresented to the investors that their investments would be protected in escrow accounts covered by restrictive provisions during the due diligence period, including a requirement that funds could not be withdrawn without the signature of plaintiffs' representative. Using these fraudulent promises as well as his status in the community, Schick successfully induced numerous individuals and entities to invest millions of dollars.

2. All factual allegations are taken from the amended complaints. Paragraph references are to the *Bayroff* amended complaint (hereafter referred to as the "Am.Compl."). Their counterparts are otherwise numbered in the *Lerner* amended complaint.

3. The amended complaints do not allege the percentage of this profit that would be paid to the investor.

## II. Governing New York Regulations Regarding Attorney Escrow Accounts

Relevant to the RICO allegations set forth in the amended complaints, there are several regulations that govern the responsibilities and obligations of attorneys maintaining attorney escrow accounts and the banking institutions within which they are maintained. In particular, pursuant to Disciplinary Rule 9–102 of the Code of Professional Responsibility ("DR 9–102"):

> (B)(1) A lawyer who is in possession of funds belonging to another person incident to the lawyer's practice of law, shall maintain such funds in a banking institution within the State of New York which agrees to provide dishonored check reports in accordance with the provisions of Part 1300 of the joint rules of the Appellate Divisions. Banking institution means a state or national bank, trust company, savings bank, savings and loan association or credit union. Such funds shall be maintained, in the lawyer's own name, or in the name of a firm of lawyers of which he or she is a member, or in the name of the lawyer or firm of lawyers of whom he or she is employed, in a special account or accounts, separate from any business or personal accounts of the lawyer or lawyer's firm, and separate from any accounts which the lawyer may maintain as executor, guardian, trustee or receiver, or in any other fiduciary capacity, into which special account or accounts all funds held in escrow or otherwise entrusted to the lawyer or firm shall be deposited.
>
> (B)(2) A lawyer or the lawyer's firm shall identify the special bank account or accounts required by paragraph (1) of this subdivision as an "Attorney Special Account," or "Attorney Trust Account," or "Attorney Escrow Account," and shall obtain checks and deposit slips that bear

such title. Such Title may be accompanied by such other descriptive language as the lawyer may deem appropriate, provided that such additional language distinguishes such special account or accounts from other bank accounts that are maintained by the lawyer or the lawyer's firm.

N.Y.Jud.Law App. at DR 9–102 (McKinney 2001) (codified at N.Y.Comp.Codes R. & Regs., tit. 22, § 1200.46[b][1], [2] (2001)). Furthermore, pursuant to the Dishonored Check Reporting Rules For Attorney Special, Trust and Escrow Accounts:

> (a) Special bank accounts required by [22 N.Y.C.R.R. § 1200.46] shall be maintained only in banking institutions which have agreed to provide dishonored check reports in accordance with the provisions of this section.
>
> (b) An agreement to provide dishonored check reports shall be filed with the Lawyer's Fund for Client Protection, which shall maintain a central registry of all banking institutions which have been approved in accordance with this section, and the current status of such agreement.
>
> (c) A dishonored check report by a banking institution shall be required whenever a properly payable instrument is presented against an attorney special, trust or escrow account which contains insufficient available funds, and the banking institution dishonors the instrument for that reason.
>
> .      .      .      .      .
>
> (h) Every lawyer admitted to the Bar of the State of New York shall be deemed to have consented to the dishonored check reporting requirements of this section. Lawyers and law firms shall promptly notify their banking institutions of existing or new attorney special, trust or escrow accounts for the purpose of facilitating the implementation and

administration of the provisions of this section.

22 N.Y.C.R.R. § 1300.1.

Each defendant is a banking institution as defined by the regulations, and each defendant has entered into a dishonored check reporting agreement with the Lawyers' Fund. The purpose of the Lawyers' Fund is "to promote public confidence in the administration of justice and the integrity of the legal profession by reimbursing losses caused by the dishonest conduct of attorneys admitted and licensed to practice law in the courts of New York State." 22 N.Y.C.R.R. § 7200.1. Claims for reimbursement of losses will be considered if

> (a)(1) the dishonest conduct alleged in the claim constituted the wrongful taking of money, securities or other property belonging to a law client or other person who entrusted it with an attorney admitted to the practice of law in New York State;
>
> (a)(2) the dishonest conduct occurred in the practice of law by an attorney admitted to practice law in New York State.

22 N.Y.C.R.R. § 7200.8. This regulation expressly exempts certain losses from eligibility for reimbursement, including "losses arising from financial transactions with attorneys that do not occur within an attorney-client relationship and the practice of law." *Id.* at § 7200.8[d]. Furthermore, claims for reimbursement must be "written and verified," and include, *inter alia*, "the terms of the attorney's professional engagement." 22 N.Y.C.R.R. § 7200.9[a].

### III. The RICO Theory

In addition to the Lawyers' Fund, the New York State Attorney Disciplinary System, the enterprise allegedly corrupted by the banks, is composed of the Appellate Division of the Supreme Court of the State of New York, the Departmental Disciplinary or Grievance Committee ("DDC/DGC") of each judicial department or district having jurisdiction, and all the approved banking institutions, such as the defendant banks, which have entered into written agreements with the Lawyers' Fund.

In support of their § 1962(c) RICO claim, plaintiffs maintain that defendants corrupted the enterprise, presumably because Schick was a major money-maker for the banks, by intentionally violating the reporting requirements of the governing regulations in three ways: First, by "knowingly and wrongfully" permitting Schick to open and maintain accounts under normal titles such as "Attorney–At–Law" and "As Attorney" when such accounts were being used as attorney escrow, attorney special and attorney trust accounts and should have been designated as such pursuant to DR 9–102, *see* Am. Compl. ¶ 7A(a); Second, by bouncing hundreds of checks written against such accounts due to insufficient funds, and not reporting these overdrafts to the Lawyers' Fund,[4] *id.* at ¶ 7B; Third, by "returning checks unpaid, marked 'Refer to Maker,' in order to evade 'bouncing' and reporting Schick's checks," thereby allowing the banks to falsely represent that the checks were not paid because there was a "mixup," such as a computer glitch or wrong account number, rather than because of insufficient funds. *Id.* at ¶ 8.

Plaintiffs allege that they would have early-on learned of Schick's scheme, and consequently been spared millions of dollars in losses, if the banks had reported Schick's check writing activities to the

---

**4.** Although the amended complaints list checks that were dishonored, identifying the amount, date and name of the account on which the checks were drawn, they do not identify the payees.

Lawyers' Fund because the Lawyers' Fund would have forwarded the banks' reports to the DDC/DGC, which would have compelled Schick to produce his records. Once Schick's defalcations were uncovered, the DDC/DGC would seek "immediate temporary suspension of the attorney." *Id.* at ¶ 88. Furthermore, those who suffered losses at Schick's hands could "be eligible for reimbursement of qualifying losses, up to a maximum of $100,000 per claim" from the Lawyers' Fund. *Id.* at ¶ 89.[5]

As for the mail and wire fraud predicate acts constituting the requisite pattern of racketeering activity, plaintiffs allege, in respect to mail fraud, that when the banks started to dishonor Schick's checks they returned them to the payees through the mails for insufficient funds, while continuing to ignore the reporting requirements. *See id.* at ¶ 260. In addition, plaintiffs contend that in furtherance of the scheme to defraud, each defendant mailed a number of misleading monthly bank statements to Schick because "they did not include any reference whatsoever to the 'refer to maker' checks." *Id.* at ¶ 261. With respect to wire fraud, plaintiffs contend that the defendants "carried out instructions from Schick to transfer funds from the Schick Attorney Fiduciary Accounts, knowingly or recklessly disregarding the fact that Schick had overdrawn and was mulcting those accounts, and either (a) wired such funds directly from a Schick Attorney Fiduciary Account to one or more recipients located outside of the State of New York, or (b) credited those funds to another Schick or Schick-related account and then wired such funds from that account to one or more recipients

located outside of the State of New York." *Id.* at ¶ 265.

In addition to their substantive § 1962(c) RICO claim, plaintiffs also allege a RICO conspiracy pursuant to § 1962(d). They claim that "based upon the conspicuous similarity and seamless continuity of the culpable acts and omissions ... there came a point in time, prior to the public revelation of Schick's scheme, when each defendant knowingly and intentionally agreed with at least one other defendant to jointly corrupt the affairs of the Enterprise by perpetuating and continuing to perpetuate the Banks' Scheme in combination with one another." *Id.* at ¶ 125.

## IV. Motions to Dismiss

Although each defendant submits a separate motion to dismiss, the arguments presented for dismissal are substantially the same: (1) plaintiffs have not sufficiently alleged standing pursuant to 18 U.S.C. § 1964(c); (2) plaintiffs have failed to plead a RICO enterprise; (3) plaintiffs have not sufficiently alleged that the defendants participated in the operation or management of the alleged enterprise; (4) predicate acts of mail fraud and wire fraud have not been pled with particularity; (5) plaintiffs have failed to plead a pattern of racketeering activity; and (6) in the absence of a substantive RICO violation, the RICO conspiracy claim must also fail. The Court need only address the standing issue.

## DISCUSSION

The standard for dismissal under Rule 12(b)(1) is the same as under Rule 12(b)(6), namely "the court must accept as true all the factual allegations in the complaint and must draw all reasonable infer-

---

5. The statutory maximum on recovery has been increased to $300,000. *See* 22 N.Y.C.R.R. § 7200.13[a].

ences in favor of the plaintiff." *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College,* 128 F.3d 59, 63 (2d Cir.1997); *see also Moore v. PaineWebber, Inc.,* 189 F.3d 165, 169 n. 3 (2d Cir.1999). The court should grant such a motion only if, after viewing the plaintiff's allegations in the most favorable light, "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Feder v. Frost,* 220 F.3d 29, 32 (2d Cir.2000).

Standing under RICO is triggered by 18 U.S.C. § 1964(c), which states that "[a]ny person injured in his business or property *by reason of* a violation of section 1962 may sue . . . in any appropriate United States district court." (Emphasis added). As the Second Circuit has formulated, RICO standing thereby requires " '(1) a violation of section 1962; (2) injury to business or property; and (3) causation of the injury by [reason of] the violation.' " *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 767 (2d Cir. 1994) (quoting *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 23 (2d Cir. 1990)). Here, the substantive RICO violation is alleged to come within the purview of subdivision (c) of § 1962, which makes it "unlawful for any person . . . associated with any enterprise . . . to . . . participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). As in *Gelt* and *Hecht,* the causation focus under subdivision (c) invariably centers on the alleged predicate acts, consistent with the Supreme Court's statement in *Sedima, S.P.R.L. v. Imrex Co. Inc.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), that "[a]ny recoverable damages by reason of a violation of § 1962(c) will flow from the commission of the predicate acts" be-

cause "the essence of the violation is the commission of those acts in connection with the conduct of the enterprise."

In *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992), the Supreme Court made clear that the subdivision (c) predicate acts must be more than the "but for" cause of the plaintiff's injuries; they must be the proximate cause as well. Thus, the nexus between the violation and the injury cannot be too remote—there must be "some direct relation between the injury asserted and the injurious conduct alleged." *Id.* at 268, 112 S.Ct. 1311. Embracing common law notions of proximate cause, the Court in *Holmes* noted that "a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by defendant's acts was generally said to stand at too remote a distance to recover." *Id.* at 268–69, 112 S.Ct. 1311. As the Second Circuit subsequently postulated, "the critical question posed by the direct injury test is whether the damages a plaintiff sustains are derivative of an injury to a third party. If so, then the injury is indirect; if not, it is direct." *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.,* 191 F.3d 229, 238–39 (2d Cir.1999).

In the context of mail and wire fraud predicate acts, the Second Circuit has conceptualized "but for" causation as "transaction causation," meaning "that *but for* the defendant's wrongful acts, the plaintiffs would not have entered into the transactions that resulted in their losses." *Moore,* 189 F.3d at 172. It views proximate cause as "loss causation," meaning that "the misrepresentation must be both an actual and a proximate source of the loss that the plaintiffs suffered." *Id.* at 170.

How then does the plaintiffs' RICO theory fit within this conceptual framework?

Apart from whether the underlying predicate acts of mail and wire fraud can substantively support a RICO claim under plaintiffs' problematic allegations, or whether they are too remote to satisfy the direct injury test, the ultimate linchpin to plaintiffs' creative efforts to stretch a common law fraud case into a statutory civil RICO scenario are the reporting regulations that serve as the requisite associational link between the banks and the enterprise. However, regardless of whether or not defendants violated the reporting requirements,[6] it seems to the Court that plaintiffs do not fall within the class of persons that these regulations seek to benefit. If such be the case, the concept of standing takes on a somewhat different aspect than the issue of proximate cause in the context of the violation of the predicate acts. Justice Scalia recognized this in his concurring opinion in *Holmes*, viewing it as a "zone-of-interests test" designed "to determine whether apart from the directness of the injury, the plaintiff is within the class of persons sought to be benefited by the provision at issue." 503 U.S. at 287, 112 S.Ct. 1311. Although Justice Scalia recognized that this terminology "may not be entirely orthodox," he reasoned that viewing it as intermingled with general notions of proximate cause "would leave us bereft of terminology to connote those aspects of the 'violation-injury connection' aspect of standing that are distinct from proximate causality." *Id.* at 288 n. *, 112 S.Ct. 1311.

Subsequent to *Holmes*, both the Seventh and Eighth Circuits have recognized the utility of the zone-of-interests test in assessing RICO standing. *See Newton v. Tyson Foods, Inc.*, 207 F.3d 444, 447 (8th Cir.2000) (recognizing that the concept of zone-of-interests "can be helpful in analyzing RICO standing"); *Israel Travel Advisory Serv., Inc. v. Israel Identity Tours, Inc.*, 61 F.3d 1250, 1258 (7th Cir.1995) ("'[a] plaintiff claiming injury by the defendant's violation of a statute must show not only that the defendant violated the law but also that the plaintiff is among the persons protected by the law"); *see also Office of Workers' Comp. Programs v. Newport News Shipbuilding and Dry Dock Co.*, 514 U.S. 122, 127, 115 S.Ct. 1278, 131 L.Ed.2d 160 (1995) (recognizing in related context that standing requires a litigant to show "that the interest he seeks to vindicate is arguably within the 'zone of interests to be protected or regulated by the statute' in question"). As for the Second Circuit, although it has cautioned that the zone of interests test "may not be substituted for the direct injury test in order to establish standing under RICO," *Laborers Local 17*, 191 F.3d at 236, it has nonetheless recognized that RICO causation embraces the question, "was the plaintiff in the category of people meant by the statute to be safeguarded," as well as the question of whether the harm that the plaintiff suffered was "that

---

**6.** It is problematic whether the banks had a duty to report since the duty arises only when a payable instrument is presented "against an attorney special, trust or escrow account." 22 N.Y.C.R.R. § 1300.1[c]. Schick's accounts apparently were not so designated, and it is incumbent on the lawyer, not the bank, to make the appropriate designation. *See* 22 N.Y.C.R.R. § 1200.46[b][2]; *In the Matter of Ajello*, 275 A.D.2d 105, 712 N.Y.S.2d 600, 603–604 (2d Dep't 2000) (disbarring attorney for, *inter alia*, "fail[ing] to properly identify his IOLA account as an attorney trust account" in violation of DR 9–102); *In the Matter of Ryan*, 264 A.D.2d 128, 703 N.Y.S.2d 247, 251 (2d Dep't 2000) (same); *In the Matter of Orseck*, 262 A.D.2d 862, 692 N.Y.S.2d 766, 768 (3d Dep't 1999) (disciplining attorney for, *inter alia*, "fail[ing] to properly title the account in accordance with [ ] [DR 9–102]"). Because the Court's disposition of the case is not dependent on a resolution of this issue, it need not reach it.

which the act meant to avoid." *Abrahams v. Young & Rubicam, Inc.*, 79 F.3d 234, 237 n. 3 (2d Cir.1996). Consequently, a RICO claim "stems from the fact that [plaintiff] was [ ] the target of the racketeering enterprise." *Id.* at 238 (internal quotation and citation omitted).

As admirable as the bank reporting requirements are, they are clearly designed to benefit an attorney's client in the context of the lawyer-client relationship; not investors who invest their monies with business people who also happen to be lawyers. The regulatory scheme makes this clear.

Initially, by its express terms, DR 9–102(B)(1) requires separate accounts only where a lawyer possesses "funds belonging to another person incident to the lawyer's practice of law." 22 N.Y.C.R.R. § 1200.46[b][1]. To be "incident" to something, means "dependent upon, appertaining or subordinate to, or accompanying something arising or resulting from something else of greater or principal importance." *Black's Law Dictionary* 762 (6th ed.1990). The regulatory language necessarily presumes that monies held in an escrow account which is identified as such by the attorney holding the account are monies paid in connection with the provision of legal services. The amended complaints are patently devoid of any allegation that the funds in Schick's bank accounts were deposited as a result of fees paid for legal representation, or were somehow being held incident to the practice of law. Investment funds are not funds held in escrow incident to the practice of law, and do not consequently come within the ambit of DR 9–102(B)(1). Notably, the plaintiffs do not refer to themselves as legal clients of Schick nor make reference to any factors that would connote a lawyer/client relationship.

Perhaps the most tell-tale sign that plaintiffs are not within the class of persons contemplated by the regulations governing the conduct of the alleged enterprise is that the regulations provide that any claim against the Lawyers' Fund for reimbursement of losses must relate to money "belonging to a law client," 22 N.Y.C.R.R. § 7200.8[a][1]; the dishonest conduct must have "occurred in the practice of law," *id.* at § 7200.8[a][2]; and the claim must set forth "the terms of the attorney's professional engagement." *Id.* § 7200.9[a]. Furthermore, specifically excluded are "losses arising from financial transactions with attorneys that do not occur within an attorney-client relationship and the practice of law." *Id.* § 7200.8[d].

## CONCLUSION

Defendants' motions to dismiss the RICO claims are granted. The Court declines to entertain supplemental jurisdiction over the state law claims and, accordingly, dismisses the amended complaints.

**SO ORDERED.**