318 F.3d 113
 Isaac LERNER, Eli Lerner, Ballyward Investment Company, Ltd., Jaime Sohacheski, Gaston Limited, Hotel Investors, Inc, Perky Limited, Abraham Rappaport, Esther Rappaport, Moshe Cohn, Establissement Somer, Joseph Kohn, Chancery Enterprises, Ltd, Rosdev Developments, Inc., Michael Rosenberg, Bruce Bayroff, Joshua Goldstein, Land Tech at Manalpan LLC., Theodore Brodie, Meyer Rosenbaum, Mr Associates LLC., Ilana Blumkin, As Trustee, Emdee Tours, Inc., Alexander Hansenfeld, Inc., Profit Sharing Retirement Plan, Pinchos Rubinson, Akiva Leiman, Estate of Boruch Rubinson, Chaim Lekowitz, Rachel Lekowitz, Naftali Lipshutz, Sarah Lipshutz, Mendel Lipshutz, Feigy Lipshutz, Reisel Bergstein, Michael Konig, Esther Wertenteil, Mark Wertenteil, Morris Friedman, Sarah Friedman, Aaron Wertenteil, Teena Wertenteil, the Regal Trade, S.A., Vavel Corp., Chadwick Funding Co. L.P., Allen Sausen, Leonard Sausen d/b/a Atassco, Keren Hachesed of Monsey, Inc., Geneva Properties, L.L.C., Mt. Pleasant Partners, Herscel Kulefsky, Albert David Pearls & Gems, Inc., Defined Benefit Pension Plan, Chai Properties Corp, Arthur Kurtz, Cresfield Associates, Inc., Weinreb Management, Howard Mermelstein, Plaintiffs-Appellants,
v.
FLEET BANK, N.A., Sterling National Bank and Trust Company of New York and Republic National Bank of New York, Defendants-Appellees.
 Docket No. 01-7755.
 United States Court of Appeals, Second Circuit.
 Argued: May 31, 2002.
 Decided: January 22, 2003.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED G. Robert Blakey, Notre Dame Law School (James B. Zane, Edward S. Rudofsky, Arlene H. Schechter, on the brief), Notre Dame, IN, for Plaintiffs-Appellants.
 Richard F. Ziegler, Cleary, Gottlieb, Steen & Hamilton (David M. Meisels, of counsel), New York, NY, for Defendant-Appellee Fleet Bank, N.A.
 Celia G. Barenholtz, Kronish Lieb Weiner & Hellman LLP (Chaya Weinberg-Brodt, of counsel), New York, NY, for Defendant-Appellee Republic National Bank of New York.
 Allen C. Wasserman, Owen & Davis PC, New York, NY, for Defendant-Appellee Sterling National Bank and Trust Company of New York.
 Before: STRAUB and SOTOMAYOR, Circuit Judges, and GOLDBERG,* Judge.
 SOTOMAYOR, Circuit Judge.
 
 
 1
 The creative pleading in the instant cases serves as a reminder why the Racketeer Influenced and Corrupt Organization Act's ("RICO") treble damages provisions are not available to remedy every possible injury that can, with some ingenuity, be attributed to a defendant's injurious conduct. Plaintiffs appeal from a judgment of the United States District Court for the Eastern District of New York (Block, J.) dismissing two companion actions, Lerner v. Fleet Bank, N.A., No. 98 CV 7778 ("Lerner"), and Bayroff v. Fleet Bank, N.A. No. 98 CV 7779 ("Bayroff"), for lack of subject matter jurisdiction. See Lerner v. Fleet Bank, N.A., 146 F.Supp.2d 224, 226 (E.D.N.Y.2001). Plaintiffs, investors who were defrauded of millions of dollars held in escrow accounts by an unscrupulous attorney, allege that the banks in which those funds were deposited are liable for their losses. Plaintiffs principally allege that the defendant banks fraudulently concealed the attorney's criminal behavior from state disciplinary authorities and thereby prevented the attorney from being disbarred. Had the attorney been disbarred, plaintiffs claim, they would have refused to make further investments with him and their losses would have been averted. The district court concluded that plaintiffs lacked standing to pursue their civil RICO claims under 18 U.S.C. § 1962 and declined to exercise supplemental jurisdiction over plaintiffs' state-law claims See id. at 232.
 
 
 2
 We hold that lack of RICO standing does not divest the district court of jurisdiction over the action, because RICO standing, unlike other standing doctrines is sufficiently intertwined with the merits of the RICO claim that such a rule would turn the underlying merits questions into jurisdictional issues. Thus, we affirm the district court's dismissal of plaintiffs' civil RICO claims because the alleged pattern of racketeering activity was not the proximate cause of plaintiffs' injuries; however, we do so not under Fed.R.Civ.P. 12(b)(1), for lack of jurisdiction, as the district court did, but rather under Fed.R.Civ.P. 12(b)(6), for failure to state a claim. Dismissal of the state-law claims in Lerner was improper, however, because federal jurisdiction in that action was also premised on diversity. 28 U.S.C. § 1332(a)(1). Finally, we find that the district court may, in its discretion, exercise supplemental jurisdiction over the state-law claims in Bayroff because RICO standing is not a jurisdictional prerequisite the absence of which would divest the district court of the original jurisdiction required to support supplemental jurisdiction. We remand the state-law claims in Bayroff for the district court to determine whether exercising supplemental jurisdiction over these claims is appropriate.
 
 BACKGROUND
 
 3
 In reviewing the district court's dismissal under either Fed.R.Civ.P. 12(b)(6) or 12(b)(1), we accept the following factual allegations contained in plaintiffs' complaints as true and draw all reasonable inferences in favor of plaintiffs. See Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (Fed.R.Civ.P. 12(b)(6)); McGinty v. State of New York, 193 F.3d 64, 68 (2d Cir.1999) (Fed.R.Civ.P. 12(b)(1)). Plaintiffs in these companion actions are victims of a fraudulent investment scheme engineered by then-attorney David Schick. Schick convinced investors that he had devised a no-risk scheme for generating a high return on their investments. Schick would bid on distressed mortgage pools at auctions by the Resolution Trust Company, the Federal Deposit Insurance Company ("FDIC"), and other banking institutions. Upon being awarded the bid, he would immediately try to re-sell the mortgage pool to another buyer for a quick profit. The acceptance of his bid was subject to a ninety-day due diligence period, so Schick assured his investors that if he was unable to find a buyer within the ninety-day time period, he would be able to rescind his original purchase without incurring any penalty. Schick's plan was apparently foolproof — except, he explained to the investors, in order to make this scheme work, Schick had to prove to the FDIC that he could complete the purchase. He would therefore be required to deposit substantial sums of cash as evidence of his good faith. This is where Schick's potential investors came in.
 
 
 4
 To convince wary investors that their money would be secure, Schick agreed to deposit the entrusted funds in escrow accounts covered by restrictive provisions. Lerner v. Fleet Bank, N.A., 146 F.Supp.2d 224, 225-27 (E.D.N.Y.2001). He also entered into escrow agreements with the investors that stated: "Escrow Agent are attorneys [sic] admitted to practice in the State of New York and shall act as fiduciary in accordance with the relevant provisions of the Judiciary Law and all other ethical or legal standards for attorneys admitted to practice in the State of New York and expressly agrees that the only person who shall be entitled to, or have any right or interest in the Escrow Deposit shall be the Depositor." Armed with these guarantees, and relying on the fact that Schick was an attorney in good standing with the New York bar, the investors turned their money over to Schick for deposit in the defendant banks. Ultimately, however, these escrow agreements provided little protection against Schick's unscrupulous conduct. Before the investors discovered his fraud, Schick had raided the accounts repeatedly and managed to steal approximately $82 million.[1]
 
 
 5
 Some of these defrauded investors pursued a federal RICO action against Fleet Bank, alleging that Fleet Bank had aided Schick in stealing their money by approving withdrawals that violated restrictive provisions on the accounts; failing to inform state banking authorities or investors of the fraud; misleading investors regarding their accounts; approving overdrafts on these accounts; and submitting to investors a fraudulent report overstating the balances of the main escrow accounts. Schmidt v. Fleet Bank, 16 F.Supp.2d 340, 344-45 (S.D.N.Y.1998). The district court dismissed these claims both for failure to plead an enterprise adequately and for failure to plead that Fleet had directed the affairs of an enterprise. Id. at 346-51.
 
 
 6
 Constrained by this prior dismissal, plaintiffs in the instant RICO actions proceed under a more creative theory of liability. During the three-year period in which Schick operated his scheme, Schick drew over 500 checks from investor accounts at times when there were insufficient funds to cover the checks.[2] Defendants extended Schick approximately $125 million in overdrafts. After a time, they began to dishonor his checks. These dishonored checks lie at the heart of this action.
 
 
 7
 Under New York's Disciplinary Code, "[a] lawyer who is in possession of funds belonging to another person incident to the lawyer's practice of law, shall maintain such funds in a banking institution within the State of New York which agrees to provide dishonored check reports" to the Lawyer's Fund for Client Protection of the State of New York ("Lawyer's Fund"). 22 N.Y.C.R.R. § 1200.46(b)(1). Lawyers are required to designate accounts holding their clients' funds "as an `Attorney Special Account,' or `Attorney Trust Account' or `Attorney Escrow Account,' and shall obtain checks and deposit slips that bear such title." Id. § 1200.46(b)(2). While Schick deposited some of the investors' money into properly designated accounts, the majority of these accounts were either labeled "attorney at law" or had no special designation.
 
 
 8
 Plaintiffs nonetheless allege that at the time of the events in question, each of the defendant banks had entered into reporting agreements with the Lawyer's Fund, as provided for by 22 N.Y.C.R.R. § 1300. Moreover, each defendant knew that Schick used these accounts to maintain funds belonging to others incident to his practice of law.
 
 
 9
 Plaintiffs claim that defendants are part of an enterprise plaintiffs term the "New York State Attorney Disciplinary System." This association-in-fact enterprise purportedly also consists of the Appellate Division of the Supreme Court of the State of New York ("Appellate Division"), the Departmental Disciplinary Committee ("DDC") or the Departmental Grievance Committee ("DGC") of each judicial department with jurisdiction over Schick, and the Lawyer's Fund. The alleged purpose of this enterprise is to enforce New York's attorney disciplinary regulations with respect to an attorney's handling of client funds. According to plaintiffs, defendant banks play a "gate-keeper" role by reporting dishonored checks to the Lawyer's Fund. When the Lawyer's Fund receives a dishonored check report, it forwards the report to the DDC or DGC. In appropriate cases, the DDC or DGC applies to the Appellate Division for the immediate temporary suspension of the attorney, and possibly for disbarment.
 
 
 10
 Plaintiffs allege that defendants set out to corrupt this enterprise by avoiding the reporting requirements. The complaints assert that the banks feared that if Schick were disciplined or disbarred, he would default on the millions of dollars he owed them, they would lose his future business, and they might potentially be subject to claims by defrauded investors. To avoid this worst-case scenario, defendants purportedly chose not to submit dishonored-check reports to the Lawyer's Fund. Plaintiffs further allege that defendants committed several predicate acts of mail and wire fraud in furtherance of this scheme by: stamping dishonored checks "refer to maker" rather than "insufficient funds" and returning those bounced checks to the payees, including plaintiffs, through the mail; mailing bank statements to Schick that neglected to mention the dishonored checks; and reassuring some of those notified of the dishonored checks that the checks had been dishonored because of a computer glitch or because the check had been written on the wrong account. Plaintiffs also allege that defendants transported stolen merchandise, although it is unclear from the complaint how this predicate offense was in furtherance of defendants' alleged scheme against the Lawyer's Fund.
 
 
 11
 Plaintiffs' theory of causation is equally novel. Plaintiffs claim that, by failing to report the bounced checks to the Lawyer's Fund as required by New York regulations, defendants prevented the New York State Attorney Discipline System from taking action against Schick. Had the Lawyer's Fund been informed that Schick was improperly overdrawing funds from his clients' escrow accounts, the Appellate Division would have immediately suspended or disbarred him from the practice of law; this would have led plaintiffs, the investors, to distrust Schick and discontinue their investments, thus sparing millions of dollars in losses.
 
 
 12
 Defrauded investors bring these two companion suits, Lerner and Bayroff, against defendants, alleging violations of 18 U.S.C. § 1962(c)-(d) and various state-law claims. These actions are identical in substance. Plaintiffs in the Bayroff action are citizens of New York, however, while plaintiffs in the Lerner action are citizens of Delaware, California, and nine foreign countries who brought their suit as a diversity action.
 
 
 13
 Defendants moved to dismiss the RICO claims in both complaints, alleging that plaintiffs had failed to plead, inter alia, the mail and wire fraud predicate acts with the requisite particularity, a RICO enterprise, or a pattem of racketeering activity. Defendants also argued that plaintiffs lacked standing to bring a RICO action. The district court consolidated the actions for purposes of resolving defendants' motions. Lerner, 146 F.Supp.2d at 225 n. 1. The district court then dismissed the actions for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1), applying a zone-of-interests analysis. Id. at 231-32. The district court held that plaintiffs do not fall within the class of persons that the reporting requirements were intended to benefit. See id.; see also Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 287-88, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) (Scalia, J., concurring) (discussing the applicability of the zone-of-interests analysis in determining standing under RICO). The district court declined to exercise supplemental jurisdiction over the state-law claims in both complaints, and dismissed the two actions in their entirety. Lerner, 146 F.Supp.2d at 228. This consolidated appeal followed.
 
 DISCUSSION
 
 14
 The district court dismissed plaintiffs' RICO claims pursuant to Fed.R.Civ.P. 12(b)(1) for lack of statutory standing. We affirm this dismissal under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief may be granted. Under both provisions, we review the district court's dismissal de novo. See Conley, 355 U.S. at 45-46, 78 S.Ct. 99; McGinty, 193 F.3d at 68.
 
 I. RICO Standing
 
 15
 The RICO statute grants standing to "[a]ny person injured in his business or property by reason of a violation of section 1962 ...." 18 U.S.C. § 1964(c). To demonstrate standing, a plaintiff must plead, at a minimum, "(1) the defendant's violation of § 1962, (2) an injury to the plaintiff's business or property, and (3) causation of the injury by the defendant's violation." Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc., 271 F.3d 374, 380 (2d Cir.2001). This third requirement is satisfied if the defendant's injurious conduct is both the factual and the proximate cause of the injury alleged. Holmes, 503 U.S. at 268, 112 S.Ct. 1311.
 
 
 16
 We have previously implied that there might be an additional standing component — that the plaintiff must fall within the zone of interests RICO seeks to protect. See Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc., 191 F.3d 229, 236 (2d Cir.1999). "[T]he zone of interests test ... is an inquiry `into whether ... the plaintiff is within the class of persons sought to be benefited by the provision at issue.'" Id. (quoting Holmes, 503 U.S. at 287, 112 S.Ct. 1311 (Scalia, J., concurring)).
 
 
 17
 While the zone-of-interests test may indeed be relevant to determining statutory standing, it is unclear precisely how this test would apply under the complex structure of the RICO statute. A RICO violation encompasses not only a violation of § 1962, but also violations of the underlying statutes that constitute the array of predicate acts. In addition, in this case, plaintiff's RICO violation also encompasses the alleged corruption of New York's regulatory system for disciplining lawyers. The district court relied upon its determination that plaintiffs did not fall within the zone of interests of the reporting regulations for this system in dismissing plaintiffs' RICO claim for lack of standing. Lerner, 146 F.Supp.2d at 231. Whether a plaintiff must fall within the zone of interests of both RICO and the underlying statutes and regulations in order to pursue a RICO action is a question we have not yet answered.
 
 
 18
 Both the Supreme Court in Holmes and this Circuit in Powers v. British Vita, P.L.C., 57 F.3d 176, 188 (2d Cir.1995), have been squarely confronted with the issue, and both courts have found it wiser to resolve those cases on grounds of proximate causality. In Holmes, the Supreme Court granted certiorari to consider whether "a party which was neither a purchaser nor a seller of securities, and for that reason lacked standing to sue under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, is free of that limitation on standing when presenting essentially the same claims under the [RICO] Act." Holmes, 503 U.S. at 265 n. 7, 112 S.Ct. 1311. The Court had previously held that standing to bring a private cause of action under § 10(b) was confined to buyers and sellers of the security. Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). The Holmes majority declined to resolve the standing issue that had split the circuits, however, as it found that plaintiffs had not suffered a direct injury and thus could not satisfy the causation element of RICO standing. Holmes, 503 U.S. at 275-76, 112 S.Ct. 1311 ("A review of the conflicting cases shows that all could have been resolved on proximate-causation grounds, and that none involved litigants like those in Blue Chip Stamps v. Manor Drug Stores, persons who had decided to forgo securities transactions in reliance on misrepresentations. Thus, we think it inopportune to resolve the issue today." (internal citation omitted)).[3]
 
 
 19
 Four concurring Justices wrote separately to express their views on the question on which certiorari had been granted. Justice O'Connor, joined by Justices White and Stevens, reasoned that standing under § 1964(c) focuses only on the "injury" of any person, not on the legal right of such plaintiff to sue for violations of the predicate acts. Id. at 280, 112 S.Ct. 1311 (O'Connor, J., concurring). Justice O'Connor therefore concluded that RICO does not incorporate the standing requirements of the predicate acts alleged. Id.
 
 
 20
 Justice Scalia also concurred in the result reached by the majority, but rejected the positions taken by Justice O'Connor and the majority regarding the RICO standing requirement. Justice Scalia instead argued that, for a plaintiff to have standing to pursue a RICO action, he or she must satisfy the traditional elements of statutory standing of the predicate statutes, thereby demonstrating the proper nexus between the injuries alleged and the predicate acts. Id. at 288-89, 112 S.Ct. 1311 (Scalia, J., concurring). These requirements include proximate causation[4] and the zone-of-interests test. Justice Scalia argued that § 1964(c) of the RICO statute did not extend the zone-of-interests protected by the underlying statutes, allowing plaintiffs to recover under RICO for a class of harms that was not encompassed within the underlying statute.[5] Id. at 288, 112 S.Ct. 1311.
 
 
 21
 In Powers, this Court was similarly confronted with the question whether a plaintiff must satisfy the standing requirements of § 10(b) in order to bring a RICO claim predicated on violations of that provision. Powers, 57 F.3d at 188. After surveying the conflicting positions taken on this standing issue in the concurring opinions in Holmes, we decided to follow the Supreme Court's lead and, refraining from entering the fray, resolved the standing issue on the grounds of proximate causation. Id.; cf. Abrahams v. Young & Rubicam, Inc., 79 F.3d 234, 238 (2d Cir.1996).[6]
 
 
 22
 Although we are troubled by the issues potentially raised by the application of the zone-of-interests test to determine standing in the RICO context, we need not delve deeply into the implications in the present case. We believe the better approach is that adopted by the Supreme Court in Holmes and this Court in Powers: if the standing issue may be resolved on proximate cause grounds, the question whether the plaintiff must also satisfy the standing requirements of the underlying statutes whose violations constitute predicate acts (the question that was addressed by the concurrences in Holmes) or the underlying regulatory system allegedly corrupted (the question that was addressed by the district court) need not be reached.[7] As plaintiffs cannot show that defendants' alleged violations of § 1962 proximately caused their injuries, they lack standing to pursue their RICO claims.[8]
 
 
 23
 Plaintiffs have not demonstrated that their injury was proximately caused "by a pattern of racketeering activity violating section 1962 or by individual RICO predicate acts." Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 23 (2d Cir.1990); see also Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 497, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) ("[T]he compensable injury necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise.... Any recoverable damages occurring by reason of a violation of § 1962(c) will flow from the commission of the predicate acts."); First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 769 (2d Cir.1994) ("RICO provides a civil remedy only to those persons injured `by reason of' the defendant's predicate acts."). First, plaintiffs principally contend that their injuries were caused by defendants' violations of state reporting requirements. At worst, this offense qualifies as a breach of defendants' agreements with the Lawyer's Fund; it certainly does not qualify as a RICO predicate act under § 1961(1). Any injury caused by the failure to abide by the reporting agreements cannot form the basis for RICO standing.
 
 
 24
 Second, to the extent that plaintiffs' complaint can be read to allege that defendants engaged in a pattern of racketeering activity that led to the concealment of Schick's improper conduct from the Lawyer's Fund,[9] the connection between the RICO violation and the injury alleged is too attenuated to satisfy the proximate cause requirement. "Central to the notion of proximate cause is the idea that a person is not liable to all those who may have been injured by his conduct, but only to those with respect to whom his acts were `a substantial factor in the sequence of responsible causation,' and whose injury was `reasonably foreseeable or anticipated as a natural consequence.'" First Nationwide Bank, 27 F.3d at 769 (quoting Hecht, 897 F.2d at 23-24); see also Laborers Local 17, 191 F.3d at 235-36. The racketeering activities alleged are not a substantial factor in the chain of causation that led to plaintiffs' losses. Nor were those losses a reasonably foreseeable consequence of that conduct.
 
 
 25
 "The mere recitation of the chain of causation alleged by the plaintiffs is perhaps the best explanation of why they do not have standing in this case." Newton v. Tyson Foods, Inc., 207 F.3d 444, 447 (8th Cir.2000). In order to demonstrate some link between the RICO violations alleged and the loss of their investments, plaintiffs must show that, if the defendant banks had not committed the predicate acts of mail and wire fraud, (1) unspecified third parties would have become aware that there were insufficient funds in the escrow accounts to cover Schick's checks; (2) the Lawyer's Fund, in some fashion, would then have become aware of these bounced checks; (3) the DDC or DGC, upon receiving the report of dishonored checks from the Lawyer's Fund, would have recommended to the Appellate Division that Schick be suspended or disbarred; (4) the Appellate Division would have investigated Schick and adopted this recommendation almost "immediately" after Schick bounced these checks; and (5) plaintiffs would have been made aware of Schick's removal from the practice of law in time to halt further investments. Each of the assumptions upon which this theory rests is inherently speculative. See id. ("The alleged injuries... are far distant along the chain of causation from [defendants'] alleged wrongs and are too attenuated and removed from those wrongs to provide a basis for standing under RICO."). For example, it would be impossible to determine if and when the Appellate Division would have disciplined Schick. Thus, there is no rational way to allocate the damages that flow from the failure of the Appellate Division to act. Cf. Laborers Local 17, 191 F.3d at 239-40 (holding that a health plan's suit against tobacco companies for their actions against plan participants was not sufficiently direct to support RICO standing because the damages claims would be incredibly speculative and dependent on unpredictable intervening events such as the agency of individual smokers).
 
 
 26
 Moreover, we have repeatedly emphasized that the reasonably foreseeable victims of a RICO violation are the targets, competitors and intended victims of the racketeering enterprise. In re Am. Express Co. S'holder Litig., 39 F.3d 395, 400 (2d Cir.1994) (holding that injury to American Express shareholders was neither the "preconceived purpose" nor the "specifically-intended consequence" of a scheme to discredit an American Express competitor); Hecht, 897 F.2d at 24 (holding that the loss of employment for failure to cooperate in RICO scheme was not proximately caused by racketeering activity because the employee was not "the target of the racketeering enterprise"); Sperber v. Boesky, 849 F.2d 60, 64 (2d Cir.1988) (holding that plaintiffs were not injured by defendant's racketeering activities with regard to companies whose stock the plaintiffs did not own, because any artificial increase in the price of stocks plaintiffs owned was too remote from defendant's illegal activities to satisfy the proximate causation requirement.).
 
 
 27
 Plaintiffs in the instant case are too far removed from the actual predicate acts committed to recover for any injuries that they suffered. The fundamental flaw in plaintiffs' theory is plaintiffs' allegation that defendants proceeded independently of Schick, without the purpose or design of aiding in his fraud against plaintiffs. Defendants' goal was to "perpetrate a fraud on the attorney disciplinary system." Lerner Compl. at ¶ 122. That alleged fraud, however, is not tied to plaintiffs' injuries from Schick's fraud. Accepting plaintiffs' allegation would mean that the Lawyer's Fund, not plaintiffs, was the target of defendants' alleged racketeering enterprise. Plaintiffs' harm is therefore an unintended and unanticipated byproduct of the banks' alleged racketeering activities.
 
 II. Diversity Jurisdiction
 
 28
 The district court declined to exercise jurisdiction over the state-law claims contained in the Lerner complaint, although diversity jurisdiction exists in the Lerner action because plaintiffs' citizenship is diverse from defendants' and the amount in controversy is more than $75,000. See 28 U.S.C. § 1332(a). On appeal, defendants contend that this dismissal was not in error because the plaintiffs improperly and deliberately manufactured jurisdiction by dividing the diverse plaintiffs and the non-diverse plaintiffs into two separate actions. Plaintiffs' "manipulation" is not, however, of the type that defeats diversity jurisdiction.
 
 
 29
 We know of no rule of law that requires plaintiffs to align with all other similarly injured plaintiffs before they may bring suit.[10] Nor are we aware of any principle that prevents an injured party from choosing among potential co-plaintiffs based on diversity concerns. Had the Lerner plaintiffs brought their suit independently of the Bayroff plaintiffs, defendants could not argue that we lacked federal jurisdiction over the Lerner action because those plaintiffs refused to allow New York citizens to join their suit. Defendants' argument therefore amounts to a claim that the filing of the Bayroff complaint in tandem with the Lerner complaint somehow divests the federal courts of jurisdiction. This clearly is not the case.
 
 
 30
 In determining whether the parties have improperly manufactured federal jurisdiction, the essential inquiry is whether "there is a bona fide controversy between... citizens of different states." Md. Cas. Co. v. W.R. Grace & Co., 23 F.3d 617, 623 (2d Cir.1993). Selecting parties to a lawsuit based upon citizenship does not implicate this concern in the same manner as the misalignment of parties, see City of Dawson v. Columbia Ave. Sav. Fund, Safe Deposit, Title & Trust Co., 197 U.S. 178, 25 S.Ct. 420, 49 L.Ed. 713 (1905), the failure to name an indispensable party, see Envirotech Corp. v. Bethlehem Steel Corp., 729 F.2d 70, 76 (2d Cir.1984), or the collusive assignment of claims, see 28 U.S.C. § 1359 ("A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court."). These practices are prohibited because the parties, through manipulation, have funneled what are essentially local disputes between non-diverse parties into the federal courts. See, e.g., Airlines Reporting Corp. v. S & N Travel, Inc., 58 F.3d 857, 861-62 (2d Cir.1995). The Lerner plaintiffs are genuinely diverse from, and have a genuine dispute with, these defendants. Their choice to band together as diverse plaintiffs injured by defendants is, therefore, not an improper attempt to manufacture federal jurisdiction.
 
 III. Supplemental Jurisdiction
 
 31
 Plaintiffs argue that the district court should have exercised supplemental jurisdiction over the Bayroff state-law claims because they are so closely related to the Lerner claims that trying the two sets of claims together is judicially economical.
 
 
 32
 A district court may exercise supplemental jurisdiction over state-law claims "in any civil action of which the district courts have original jurisdiction," as long as the state-law claims "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). The Bayroff plaintiffs' state-law claims clearly fall within the same case or controversy as their RICO claim; thus, the second portion of the test is easily met in this case. The more difficult question is whether the Bayroff plaintiffs' lack of RICO standing implies a jurisdictional bar to their RICO claims. If so, the district court did not have "original jurisdiction" over the action because the RICO claim was the only federal claim and, for the Bayroff plaintiffs, the only basis for subject matter jurisdiction. See 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").
 
 
 33
 Because the requirements set forth in § 1964(c), including that a plaintiff's injury be proximately caused by defendants' conduct, are often termed "RICO standing," courts sometimes discuss them as jurisdictional requirements, akin to constitutional standing. See, e.g., Moore v. PaineWebber, Inc., 189 F.3d 165, 169 n. 3 (2d Cir.1999). But see Rent Stabilization Ass'n v. Dinkins, 5 F.3d 591, 594 & n. 2 (2d Cir.1993) (stating that "dismissals for lack of standing may be made pursuant to Fed.R.Civ.P. 12(b)(6), rather than [as a defect in federal jurisdiction pursuant to] Fed.R.Civ.P 12(b)(1)" and clarifying that "standing and subject matter jurisdiction are separate questions"). Indeed, both statutory standing under RICO and constitutional standing concern whether the plaintiff at issue is the appropriate plaintiff to bring a claim. See Sedima, 473 U.S. at 496, 105 S.Ct. 3275 (holding that a plaintiff "only has standing [under RICO] if ... he has been injured in his business or property by the conduct constituting the violation" (emphasis added)); Lujan v. Defenders of Wildlife, 504 U.S. 555, 563, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ("[T]he `injury in fact' test [for constitutional standing]... requires that the party seeking review be himself among the injured." (quoting Sierra Club v. Morton, 405 U.S. 727, 734, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972))). Because RICO standing is not a constitutional prerequisite to jurisdiction and the determination that proximate causation is lacking is sufficiently intertwined with the merits of the RICO claim, however, we find that dismissal for failure to plead proximate causation between the alleged RICO violation and plaintiffs' injuries does not divest the district court of original jurisdiction and, therefore, the exercise of supplemental jurisdiction would be permissible pursuant to 28 U.S.C. § 1367(a).
 
 
 34
 Standing generally has two aspects: constitutional standing, a mandate of the "case or controversy" requirement in Article III, and prudential considerations of standing, which involve "judicially self-imposed limits on the exercise of federal jurisdiction ...." Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). Prudential considerations include "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." Id. Finally, a related aspect of standing, statutory standing, is broadly described as a part of the prudential considerations regarding the proper limits of jurisdiction.[11] See id.; Law Offices of Curtis V. Trinko, L.L.P. v. Bell Atl. Corp., 305 F.3d 89, 97 (2d Cir.2002).
 
 
 35
 It is clear that constitutional standing is a jurisdictional prerequisite to suit. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 101, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) ("While some ... cases must be acknowledged to have diluted the absolute purity of the rule that Article III jurisdiction is always an antecedent question, none of them even approaches approval of a doctrine of hypothetical jurisdiction that enables a court to resolve contested questions of law when its jurisdiction is in doubt."). Issues relating to the merits of an action, almost by definition, are not jurisdictional. See id. at 89, 118 S.Ct. 1003. Although prudential considerations of standing are also generally treated as jurisdictional in nature, see, e.g., Thompson v. County of Franklin, 15 F.3d 245, 248 (2d Cir.1994), the applicability of this rule to RICO's statutory proximate cause requirement is less clear.[12]
 
 
 36
 In Steel Co., the Supreme Court noted that courts may determine whether a cause of action exists under a given statute, an issue of statutory construction that goes to the merits of the action, before addressing the zone-of-interests prudential dimension of standing, an issue the Court labeled as statutory standing. See id. at 97, 118 S.Ct. 1003; see also Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers, 414 U.S. 453, 465 n. 13, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974) (deciding whether a statutory cause of action existed before determining whether the plaintiff met the statutory standing requirements). As the Supreme Court explained:
 
 
 37
 [T]he merits inquiry and the statutory standing inquiry often `overlap.' The question whether this plaintiff has a cause of action under the statute, and the question whether any plaintiff has a cause of action under the statute are closely connected — indeed, depending upon the asserted basis for lack of statutory standing, they are sometimes identical, so that it would be exceedingly artificial to draw a distinction between the two.
 
 
 38
 Steel Co., 523 U.S. at 97 n. 2, 118 S.Ct. 1003 (internal citation omitted). Thus, at least in some circumstances, lack of statutory standing does not divest a district court of jurisdiction to determine the underlying merits of the action. In declining to require statutory standing as a prerequisite to jurisdiction when the merits of whether a cause of action exists are so intertwined with the statutory standing question, the Supreme Court reasoned that if "all cause-of-action questions may be regarded as jurisdictional questions, and thus capable of being decided where there is no genuine case or controversy, it is hard to see what is left of that limitation in Article III." Id. at 93, 118 S.Ct. 1003.
 
 
 39
 In determining whether RICO's proximate cause requirement should be treated as jurisdictional, we take a cue from the Steel Co. Court's emphasis on the problem of having merits issues become jurisdictional if merits issues are so intertwined with the standing issue that any distinction becomes "exceedingly artificial." Id. at 97 n. 2, 118 S.Ct. 1003. Our decision in Thompson is not to the contrary. In Thompson, we held that standing, whether in its constitutional or prudential form, was a jurisdictional limitation and as such could not be waived. Thompson, 15 F.3d at 248. The question in Thompson was whether an individual plaintiff could maintain an action under the Nonintercourse Act, 25 U.S.C. § 177, which regulates the ownership of Indian tribal land, or whether the only proper plaintiff was the Indian tribe itself. Thus, in Thompson, the issue of statutory standing did not implicate the merits of the action, which related to the proper boundaries of the St. Regis reservation; it related solely to the question whether individual members of an Indian tribe could sue under the Nonintercourse Act.
 
 
 40
 Returning to the particular statutory standing question before us, we note that we have previously suggested in dictum that RICO's causation requirement raises a jurisdictional issue. Moore, 189 F.3d at 169 n. 3 ("Because loss causation is an element of standing to sue under the RICO statute, the appropriate ground of dismissal for failure to plead loss causation would seem to be the lack of subject matter jurisdiction."); cf. Seward v. Devine, 888 F.2d 957, 964 (2d Cir.1989) ("The exercise of pendant jurisdiction ... should abide" the district court's finding with respect to RICO standing.). Still, we recognized in Moore that we have treated dismissals for lack of RICO standing as dismissals for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6), rather than as dismissals for lack of subject-matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1). Moore, 189 F.3d at 169 n. 3; see, e.g., Burdick v. Am. Express Co., 865 F.2d 527, 528 (2d Cir.1989) (per curiam). As we noted in Moore, this distinction rarely has practical consequences, because the standards for dismissal under 12(b)(6) and 12(b)(1) are substantively identical. Moore, 189 F.3d at 169 n. 3. But see Thompson, 15 F.3d at 249 (noting that the party invoking the jurisdiction of the court has the burden of proof in a 12(b)(1) motion, in contrast to a 12(b)(6) motion, in which the defendant has the burden of proof).
 
 
 41
 In this case, however, the difference between a jurisdictional bar to bringing a claim and a failure to state a claim under Fed.R.Civ.P. 12(b) is critical, because it determines whether the district court may exercise supplemental jurisdiction over the Bayroff state-law claims. To our knowledge, only one Circuit has directly addressed this issue in an analogous situation, holding that statutory standing under the antitrust laws is not a prerequisite to federal subject matter jurisdiction. See In re Lorazepam & Clorazepate Antitrust Litig., 289 F.3d 98, 107-08 (D.C.Cir.2002) ("Unlike constitutional standing, this court's jurisdiction does not turn on antitrust standing.").
 
 
 42
 In Lorazepam, the D.C. Circuit relied upon the Supreme Court's differentiation between antitrust standing and constitutional standing in Associated General Contractors of Cal. v. Cal. State Council of Carpenters, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). In Associated General Contractors, the Supreme Court stated that determining "whether [plaintiff] may recover for the injury it allegedly suffered by reason of the defendants' coercion against certain third parties ... requires us to evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." Id. at 535, 103 S.Ct. 897 "The label "antitrust standing" has traditionally been applied to some of the elements of this inquiry. As commentators have observed, the focus of the doctrine of `antitrust standing' is somewhat different from that of standing as a constitutional doctrine." Id. at 535 n. 31, 103 S.Ct. 897.
 
 
 43
 While the Lorazepam court does not make its reasoning explicit, it is consistent with the guideline articulated in Steel Co. that if statutory standing is essentially indistinguishable from the merits of the action, its absence is not a jurisdictional bar to suit, but a failure to state a claim. As Associated General Contractors emphasizes, the proximate causation requirement in antitrust standing requires a court to evaluate the merits of the action. Associated Gen. Contractors, 459 U.S. at 535, 103 S.Ct. 897; see also Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) (distinguishing question whether plaintiff asserted a legal interest that was harmed by agency action from the question of standing; "[the] legal interest test goes to the merits. The question of standing is different. It concerns, apart from the `case' or `controversy' test, the question whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.").
 
 
 44
 Similarly, the requirement that a plaintiff demonstrate proximate causation to have standing under the RICO statute goes to the merits of the action. "Where the plaintiff alleges each element of a [RICO] violation, the compensable injury necessarily is the harm caused by [the] predicate acts ...." Sedima, 473 U.S. at 497, 105 S.Ct. 3275. In evaluating whether a plaintiff has standing under RICO, the court must, as in an antitrust case, "evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." Associated Gen. Contractors, 459 U.S. at 535, 103 S.Ct. 897. Thus, the issue of proximate causation in the RICO standing context is sufficiently intertwined with the merits of the RICO claim that any potential distinction between statutory standing as a jurisdictional issue and the merits issue is untenable. It would change the merits issues into limitations on jurisdiction.
 
 
 45
 By implicitly addressing whether lack of statutory standing under RICO is a jurisdictional bar to suit, other courts reinforce our determination that RICO standing is not a jurisdictional issue. See, e.g., Maio v. Aetna, Inc., 221 F.3d 472, 481-82 n. 7 (3d Cir.2000) (noting that the Third Circuit's practice was to treat RICO and antitrust standing as non-jurisdictional, but declining to decide whether this practice was proper); DeMauro v. DeMauro, 115 F.3d 94, 96 (1st Cir.1997) (stating that whether a plaintiff has pled "a claim of `injury' to her `business or property' as required for a civil RICO damages action... is sometimes described as a `standing' issue" and noting that "[t]here is plainly a case or controversy under Article III; but the statutory precondition of injury to business or property must also be met"); cf. Whalen v. Carter, 954 F.2d 1087, 1097 (5th Cir.1992) ("[B]ecause we have concluded that [plaintiff] might have the requisite standing to assert his RICO claims, we note that there is at least some possibility [plaintiff] could assert his state law claims under 28 U.S.C. § 1367(a) .... Neither [plaintiff] nor the defendants have briefed the issue whether the district court can exercise supplemental jurisdiction here.").
 
 
 46
 In sum, despite describing the proximate causation requirement as "RICO standing," such standing is not jurisdictional in nature under Fed.R.Civ.P. 12(b)(1), but is rather an element of the merits addressed under a Fed.R.Civ.P. 12(b)(6) motion for failure to state a claim. RICO standing is sufficiently intertwined with the merits of the action, such that its determination requires an evaluation of the merits of the action and makes any potential distinction between the merits and RICO standing exceedingly artificial.
 
 
 47
 Thus, Bayroff plaintiffs' lack of statutory standing does not divest the district court of original jurisdiction over the Bayroff action. The district court had original jurisdiction to support the exercise of supplemental jurisdiction over the Bayroff plaintiffs' state-law claims.
 
 
 48
 Having determined that the district court may exercise supplemental jurisdiction over the Bayroff state-law claims, we now turn to the prudential aspects of whether the district court should in fact do so. The factors that a district court should consider in making this decision are unchanged by our analysis above. In most circumstances, a district court should decline supplemental jurisdiction if all federal claims have been dismissed at the pleading stage. See United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Because the district court must adjudicate identical issues in Lerner, however, judicial economy might best be served by exercising supplemental jurisdiction over the Bayroff state-law claims. Because it dismissed both the Lerner and Bayroff actions, the district court did not consider whether retaining supplemental jurisdiction over the Bayroff state-law claims might be appropriate given that it retains jurisdiction over the Lerner state-law claims. As this decision is within the district court's discretion, we remand the Bayroff action for its determination.
 
 CONCLUSION
 
 49
 For the reasons stated, we affirm the district court's dismissal of plaintiffs' RICO claims for lack of standing, but we do so under Rule 12(b)(6) for failure to state a claim rather than under Rule 12(b)(1) as the district court did. Because the district court has diversity jurisdiction over the Lerner plaintiffs' state-law claims we vacate the dismissal of the Lerner complaint and remand for adjudication of the Lerner state-law claims. We also vacate the dismissal of the Bayroff state-law claims and remand to the district court for determination whether the exercise of supplemental jurisdiction is appropriate in this case.
 
 
 
 Notes:
 
 
 *
 The Honorable Richard W. Goldberg, of the United States Court of International Trade, sitting by designation
 
 
 [1]
 Schick eventually pled guilty to fraud in the Southern and Eastern Districts of New YorkSee Schmidt v. Fleet Bank, 16 F.Supp.2d 340, 344 (S.D.N.Y.1998).
 
 
 [2]
 It is unclear from the complaints whether these bounced checks were related to Schick's fraudulent schemes, or if they constituted separate misconduct on his part
 
 
 [3]
 In holding that a plaintiff did not have standing to pursue a RICO action unless his or her injuries were proximately caused by the violation of the RICO statute, the Court relied upon the fact that the explicit statutory language echoed the language of the Sherman Act, which federal courts had read as incorporating common-law principles of proximate causationHolmes, 503 U.S. at 267, 112 S.Ct. 1311.
 
 
 [4]
 Justice Scalia therefore rejected the majority's position that the proximate causality requirement under RICO is derived from the statute's express languageHolmes, 503 U.S. at 287, 112 S.Ct. 1311.
 
 
 [5]
 Neither Justice O'Connor nor Justice Scalia discussed the particular zone-of-interests test that the district court focused upon, that is, the zone of interests of the reporting regulations that were a part of the underlying regulatory system allegedly corrupted; the Justices focused instead on the potential application of a zone-of-interests test for the underlying predicate acts that constituted a RICO violation
 
 
 [6]
 InAbrahams, we used the language of zone-of-interests, rather than proximate cause, to discuss standing requirements under the RICO statute. Abrahams, 79 F.3d at 237 (reframing the standing inquiry to focus on whether the plaintiff was in the category the statute intended to protect, and whether the harm that occurred was the mischief the statute sought to avoid). Yet in so doing, we were not importing an additional standing requirement; we merely sought to apply the same standing test endorsed by the Holmes Court under a more precise terminology. Id. at 237 n. 3. Our fear was that use of the proximate cause language in discussions of statutory standing could lead to confusion with its common-law counterpart. Id. As Abrahams recognized, however, RICO proximate causation is a distinct concept — one that sometimes overlaps with zone-of-interests analysis. Both of these statutory standing principles are grounded on similar policy considerations, imposing limitations on the types of injuries that are sufficiently related to core RICO concerns as to be cognizable. Thus, the reasonably foreseeable victim of a RICO enterprise will often be, unsurprisingly, the type of victim the RICO statute seeks to protect. Indeed, Justice Scalia has implied that proximate causality, as used in the statutory context, may simply be an element of the zone-of-interests test. Holmes, 503 U.S. at 287 n. *, 112 S.Ct. 1311 (Scalia, J., concurring). In subsequent cases, we have deemed it prudent to revert to the proximate cause terminology employed in Holmes when speaking of this same causation principle. See Laborers Local 17, 191 F.3d at 234 n. 3. Here, we limit our discussion to proximate causation.
 
 
 [7]
 We encourage district courts to follow this approach in future opinions addressing RICO standing issues
 
 
 [8]
 Plaintiffs have, however, alleged an injury "fairly traceable" to defendants' conduct, and therefore meet the lesser burden for constitutional standingSee Ctr. for Reprod. Law & Policy v. Bush, 304 F.3d 183, 191-92 (2d Cir.2002). Specifically, plaintiffs allege that their injuries were fairly traceable to defendants' conduct because had defendants me their reporting requirements Schick would have been disbarred promptly, and plaintiffs would have ceased investing in Schick's scheme. Thus, plaintiffs' complaint is founded upon the allegation that the New York reporting requirements applied to the bank accounts Schick used.
 Defendants point out that an attorney's duty to keep funds in segregated escrow accounts applies only to "[a] lawyer who is in possession of funds belonging to another person incident to the lawyer's practice of law...." See 22 N.Y.C.R.R. § 1200.46(b)(1) (emphasis added); see also id. § 7200.8(d) (exempting "losses arising from financial transactions with attorneys that do not occur within an attorney-client relationship and the practice of law" from the list of injuries that the Lawyer's Fund will reimburse). As the reporting requirements only apply to such accounts, defendants assert that they had no duty to report any irregularities and therefore cannot be liable for failure to do so. See 22 N.Y.C.R.R. § 1300.1(c) ("A dishonored check report by a banking institution shall be required whenever a properly payable instrument is presented against an attorney special, trust or escrow account which contains insufficient available funds, and the banking institution dishonors the instrument for that reason.") Although plaintiffs are not so specific as to allege that they contacted Schick for the purpose of obtaining legal advice on that Schick provided them with legal advice, the complaint refers to the investors as Schick's "clients." In addition, while the majority of these accounts were not designated as escrow or trust accounts, plaintiffs allege that defendants knew that at least some of these accounts were subject to the reporting requirements, but willfully ignored these requirements.
 Finally, plaintiffs allege that the fraud was so substantial that defendants' report of the overdrafts and other irregularities "would have resulted in Schick's immediate suspension and/or disbarment" before plaintiffs' made further investments or the funds were misappropriated. While sufficiently tenuous to fail to demonstrate proximate causation, we cannot say, taking the facts alleged in the complaint as true, that plaintiffs do not allege an injury fairly traceable to defendants' conduct.
 
 
 [9]
 This strained reading of the complaint presents its own problems, as plaintiffs have provided scant detail regarding the nature of these predicate acts of mail and wire fraud, and many of the predicate acts that have been described appear to bear no relation to the defendants' scheme to conceal Schick's bounced checks from the Lawyer's Fund
 
 
 [10]
 There is no allegation in the present case that any of theBayroff plaintiffs are indispensable parties to the Lerner action and that their joinder was therefore required. See Fed.R.Civ.P. 19(b).
 
 
 [11]
 Some courts find statutory standing to be a separate, third aspect of standingSee, e.g., Libertad v. Welch, 53 F.3d 428, 436 (1st Cir.1995) (discussing constitutional considerations, prudential considerations, and statutory RICO standing in turn). Our analysis does not depend on whether statutory standing is a separate aspect of standing or a part of the prudential aspect of standing; we therefore decline to address the issue at this time.
 
 
 [12]
 Although theHolmes Court derived its interpretation of the proximate cause requirement from the language of § 1964(c), Holmes v. Sec. Investor Protection Corp., 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992), it has been suggested that the proximate cause requirement is really part and parcel of our prudential zone-of-interests test. See id. at 286-88, 112 S.Ct. 1311 (Scalia, J., concurring in the judgment); Moore v. PaineWebber, Inc., 189 F.3d 165, 178-79 (2d Cir.1999) (Calabresi, J., concurring). While this may be true, we note that civil RICO specifically affords relief to victims of racketeering enterprises, which plaintiffs claim to be; as such, the question whether plaintiffs have sufficiently alleged causation between the alleged RICO violation and their injuries goes to the merits of their particular claim rather than to the more abstract question whether they fall within the statute's zone-of-interests. See, e.g., Holmes, 503 U.S. at 287, 112 S.Ct. 1311 (Scalia, J., concurring in the judgment) (distinguishing proximate causation from the question whether plaintiff "is within the class of persons sought to be benefitted by the provision at issue").